**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | **No. 17 C 7466** |
| ) | |
| **v.** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **JULIO LEIJA-SANCHEZ** ) | |
| ――――――――――――――――――――――― ) | |
| ) | |
| **UNITED STATES OF AMERICA** ) | **No. 17 C 8584** |
| ) | |
| **v.** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **MANUEL LEIJA-SANCHEZ** ) | |
| ――――――――――――――――――――――― ) | |
| ) | |
| **UNITED STATES OF AMERICA** ) | **No. 18 C 269** |
| ) | |
| **v.** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **GERARDO SALAZAR-RODRIGUEZ** ) | |
| ――――――――――――――――――――――― ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Petitioners Julio Leija-Sanchez, Manuel Leija-Sanchez, and Gerardo Salazar-Rodriguez were convicted in 2013 of murder in aid of racketeering, racketeering conspiracy, conspiracy to commit murder abroad, and other crimes. Three years later, their convictions were affirmed by the Court of Appeals. *See United States v. Leija-Sanchez*, 820 F.3d 899 (7th Cir. 2016). Petitioners now seek relief from their convictions and sentences under 28 U.S.C. § 2255, each arguing that he received ineffective assistance of counsel at trial and on appeal. For the reasons discussed below, the petitions are denied.

### BACKGROUND[1]

In a superseding indictment filed October 23, 2007, the Government charged Petitioners with leading a Chicago-based criminal enterprise that created and sold fraudulent government documents, such as green cards, Social Security cards, driver's licenses, and state identification cards. The Government also alleged that Petitioners smuggled aliens and arranged for the murder of a business competitor, Guillermo Jimenez Flores (referred to as "Montes"), in Mexico.[2] (*See* Superseding Indictment [146]; Pet. at 3–4; Gov't's Resp. at 2.) The indictment charged Petitioners with document-fraud conspiracy, 18 U.S.C. § 371 (Count 1); racketeering conspiracy, *id.* § 1962 (Count 2); murder in aid of racketeering, *id.* § 1959 (Counts 3 and 4); as to Julio and Gerardo, murder for hire, *id.* § 1958 (Count 5); conspiracy to commit murder abroad, *id.* § 956 (Counts 6 and 7); attempted money laundering, *id.* § 1956 (Count 8); as to Julio and Manuel, alien smuggling, *id.* § 1324 (Count 10); and as to Julio and Manuel, illegal transfer of currency, 31 U.S.C. § 5332 (Count 11).[3] (*See* Superseding Indictment.)

Before trial, Petitioner Julio, through counsel, moved to dismiss Count 3. He argued that he could not be charged under 18 U.S.C. § 1959 (murder in aid of racketeering) for the murder of Montes, which took place on Mexican soil. This court granted that motion, but the Seventh

---

[1] Most record citations are to Petitioners' criminal docket: No. 07 CR 224 (N.D. Ill.). Petitioners' § 2255 motions appear on three separate civil dockets in this district: No. 17 C 7466 (Julio), No. 17 C 8584 (Manuel), and No. 18 C 269 (Gerardo).

Petitioners' briefs, and the Government's respective responses, are virtually identical. In the interest of clarity, the court generally cites only to Petitioner Julio's brief and the Government's response thereto. (*See* Pet'r's Mem. of Law, No. 17 C 7466 [3] (hereinafter "Pet."); Gov't's Resp., No. 17 C 7466 [11].)

[2] The briefs filed on direct appeal of Petitioners' convictions provide further summary of the evidence adduced at trial. *See* Joint Brief of Defendant-Appellants at 4–20, *United States v. Leija-Sanchez*, 820 F.3d 899 (7th Cir. 2016) (No. 14-1393), 2015 WL 1020389; Brief of the United States at 2–19, *United States v. Leija-Sanchez*, 820 F.3d 899 (7th Cir. 2016) (No. 14-1393), 2015 WL 3819389.

[3] The Government voluntarily dismissed Counts 4, 5, and 11 before trial [799].

Circuit reversed on interlocutory appeal.  The Court of Appeals rejected the "extraterritoriality" argument and held that § 1959 "applies to a murder in another nation designed to facilitate the operation of a criminal enterprise in the United States."  *United States v. Leija-Sanchez* (*Leija-Sanchez I*), 602 F.3d 797, 802 (7th Cir. 2010).

Petitioners were tried jointly in 2013.[4]  At the end of the six-week trial, the jury found each Petitioner guilty on all counts against him [856, 857, 858], although this court later granted Petitioners' motions for acquittal with respect to the alien smuggling charge in Count 10 of the indictment [910, 911].[5]  The jury also made special findings based on the murder in Mexico, with the effect of raising the maximum penalty for Count 2, racketeering conspiracy, to life imprisonment [849].  This court sentenced Petitioners to concurrent terms of life imprisonment on Counts 2 and 3; 20 years imprisonment on Counts 6, 7, and 8; and 60 months on Count 1 [928, 930, 932, 942, 944, 946].

Petitioners appealed their convictions to the Seventh Circuit.[6]  They argued that (1) a conviction for murder in aid of racketeering under 18 U.S.C. § 1959 cannot be predicated on a murder in Mexico;[7] (2) the maximum sentence for a racketeering conspiracy under 18 U.S.C. § 1962 cannot be increased to life imprisonment based on a murder in Mexico; (3) a defendant cannot be convicted for conspiracy to commit murder abroad under 18 U.S.C. § 956 if he was

---

[4]     At trial, Petitioner Julio was represented by counsel Patrick W. Blegen, Daniel A. Rufo, and Paul M. Brayman; Manuel was represented by Scott J. Frankel and Ellen R. Domph; and Gerardo was represented by Christopher W. Graul and William O. Walters.

[5]     The counts charged in the indictment were renumbered for trial.  In this opinion, the court refers to the counts as they are numbered in the Superseding Indictment and in the judgments of conviction.

[6]     On appeal, Petitioner Julio was represented by counsel Patrick W. Blegen and Jodi L. Garvey; Manuel was represented by Scott J. Frankel; and Gerardo was represented by Gareth G. Morris.

[7]     Although this argument presented the same issue the Seventh Circuit had already addressed in *Leija-Sanchez I*, Petitioners argued, unsuccessfully, that the Seventh Circuit should overrule *Leija-Sanchez I* based on the Supreme Court's intervening decision in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).

not in the United States at the time of the conspiracy; and (4) the Government, during its closing argument, improperly contradicted its own expert witness regarding the number of times the murder victim had been shot. The Seventh Circuit agreed with the second argument and reduced the sentences under 18 U.S.C. § 1962 (Count 2) to 20 years, but otherwise affirmed the judgments of conviction. *United States v. Leija-Sanchez* (*Leija-Sanchez II*), 820 F.3d 899, 904 (7th Cir. 2016). Because the Seventh Circuit upheld the conviction for murder in aid of racketeering, 18 U.S.C. § 1959, which carried a mandatory life sentence, the *Leija-Sanchez II* decision made no difference for Petitioners' terms of imprisonment. The Seventh Circuit denied Petitioners' requests for rehearing and rehearing en banc, and the Supreme Court denied their petition for a writ of certiorari. *See Leija-Sanchez v. United States*, 137 S. Ct. 1327, 197 L. Ed. 2d 544 (2017) (mem.).

Petitioners, acting pro se, timely filed these petitions under 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences. Petitioners' opening briefs are essentially identical, as are the Government's responses.

Long after Petitioner Julio's petition had been fully briefed, he filed an additional memorandum. (*See* Def.'s Am. Mot., No. 17 C 7466 [*16].) Styled as an "amended" version of his motion, this brief set out a new legal theory regarding extraterritoriality issues unrelated to the Sixth Amendment arguments raised in Julio's original petition. This new brief, which was filed over two and a half years after the Supreme Court denied Petitioners' petition for a writ of certiorari, plainly exceeded the one-year limitations period set by 28 U.S.C. § 2255(f). It would thus be timely only if it related back to Julio's original petition. To relate back, an amendment must assert a claim "that arose out of the conduct, transaction, or occurrence set out" in the original motion. FED. R. CIV. P. 15(c)(1)(B). An amendment to a § 2255 petition does not relate back (and thereby escape the one-year statute of limitations) merely because it relates to the same trial, conviction, or sentence as a timely-filed claim. *Beason v. Marske*, 926 F.3d 932, 938 (7th Cir. 2019) (citing *Mayle v. Felix*, 545 U.S. 644, 662 (2005)). To relate back, the new claims

4

must be based on the same "common core of operative facts" as the original claims.  *Id.*  As mentioned above, that is not the case here.  Because Julio's amended brief raises a legal theory wholly distinct from his ineffective-assistance argument, the court rejects it for untimeliness.[8]

After Petitioner Gerardo filed his opening brief (but before the Government had filed its response), he filed a motion for the court to entertain an additional ineffective-assistance argument related to the identification of his voice at trial.  (*See* Mot. for Court to Entertain Add. Claims of Ineffective Counsel, No. 18 C 269 [*10].)  The court granted Gerardo's motion "without prejudice to the government's objections, if any."  (Minute Order, No. 18 C 269 [*11].)  In the Government's response brief, it did not address the voice-identification argument whatsoever.  (Gov't's Resp., No. 18 C 269 [*19].)  Gerardo then supplemented the argument in his reply brief.  (Movant's Reply, No. 18 C 269 [*32].)  The court addresses the voice-identification argument below.

## DISCUSSION

An individual in federal custody may seek postconviction relief on the ground that he was sentenced "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255.  Relief under § 2255 is appropriate only for "an error of law that is jurisdictional, constitutional, or

---

[8]       In any case, Julio's additional memorandum is meritless.  Julio challenges the basis for his convictions and sentences under 18 U.S.C. § 1962 (Count 2) and 18 U.S.C. § 1959 (Count 3).  He relies mainly on *United States v. Flores*, 912 F.3d 613 (D.C. Cir. 2019), in which the D.C. Circuit held that a murder that occurred in Mexico could not be used to enhance a sentence under § 1962.  *Flores*, 912 F.3d at 230.  In this case, Julio already benefitted from an equivalent holding:  In *Leija Sanchez II*, the Seventh Circuit held that the murder in Mexico could not be used to enhance his § 1962 sentence from 20 years to life imprisonment, and it ordered that Petitioners' § 1962 sentences be reduced accordingly.  Neither *Flores* nor any other authority Julio cites, however, casts doubt on his conviction or sentence under § 1959, which the Seventh Circuit discussed extensively in *Leija Sanchez I* and *II*.

constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004) (quoting *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1991)). Because § 2255 "asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process," it is considered an "extraordinary remedy." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). The statute entitles a petitioner to an evidentiary hearing if he " 'alleges facts that, if proven, would entitle him to relief,' " but a hearing is not necessary if " 'the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.' " *Bruce v. United States*, 256 F.3d 592, 597 (7th Cir. 2001) (first quoting *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994); then quoting 28 U.S.C. § 2255).[9]

The Sixth Amendment "guarantees the accused in a criminal case the right to the effective assistance of counsel." *Vinyard v. United States*, 804 F.3d 1218, 1224 (7th Cir. 2015). This right is " 'firmly established' not only for trial but also for a first appeal as of right." *Id.* (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Claims of ineffectiveness are governed by the familiar two-part test from *Strickland v. Washington*, 466 U.S. 668 (1984). Under that test, a petitioner must show "that his counsel's performance was unreasonable and that the deficient performance prejudiced his defense." *Peterson v. Douma*, 751 F.3d 524, 531 (7th Cir. 2014).

To satisfy *Strickland*'s deficient-performance requirement, a petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Yu Tian Li v. United States*, 648 F.3d 524, 527–28 (7th Cir. 2011); *see also United States v. Jones*, 635 F.3d 909, 915 (7th Cir. 2011) (stating that to support a

---

[9]      Unlike with some other types of claims, "there is no procedural default for failure to raise an ineffective-assistance claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 503–04 (2003). An ineffective assistance of counsel claim may, and often should, be raised for the first time in a § 2255 petition. *Id.* at 504; *see also United States v. Flores*, 739 F.3d 337, 341 (7th Cir. 2014) (noting that it is often "imprudent to present an ineffective-assistance argument on direct appeal").

claim of ineffective assistance, counsel's performance must be "objectively deficient" and fall "outside the wide range of competent representation").   "[A] claim of ineffective assistance based on counsel's failure to object is 'tied to the admissibility of the underlying evidence.' " *Jones v. Brown*, 756 F.3d 1000, 1008 (7th Cir. 2014) (quoting *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001)).   Thus, "[i]f evidence admitted without objection is, in fact, admissible, then 'failing to object to [that] evidence cannot be a professionally 'unreasonable' action.' " *Id.* at 1008–09 (quoting *Hough*, 272 F.3d at 898).   Appellate counsel acts unreasonably where they "fail[] to raise an issue that was both obvious and clearly stronger than the issues [they do] raise." *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009).   To satisfy *Strickland*'s prejudice requirement, a petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.   "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Petitioners believe their trial and appellate counsel were ineffective for several reasons, as detailed below.

## I.      Propensity Evidence in Opening Statements

Petitioners Julio and Manuel contend, first, that their lawyers were ineffective for failing to object to the Government's reference, during its opening statement, to Petitioners' conduct in the early 1990s.   According to Petitioners, this reference served as propensity evidence in violation of Federal Rule of Evidence 404(b).   (Pet. at 7–10.)

Rule 404(b) generally prohibits evidence of "any other crime, wrong, or act" if used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1).   In other words, the rule prohibits "evidence of prior bad acts to prove or hint to the jury that a defendant is the 'kind of person' who would commit an act like the one for which he is charged." *United States v. Carson*, 870 F.3d 584, 598 (7th Cir. 2017).   Even if evidence of uncharged acts is not introduced for an

impermissible propensity-related purpose, a court may exclude the evidence if the risk of unfair prejudice substantially outweighs its probative value.  FED. R. EVID. 403.

Petitioners' argument centers on a single statement made by the Government during its opening statement at trial:

> From at least the early 1990s and 1993, when Manuel was only in his early 20s and Julio was only a teenager, these defendants had already launched their fraudulent identification document enterprise.  In 1993 Chicago Police Department officers encountered these defendants in an apartment in Chicago in possession of fake IDs.

(Trial Tr. Vol. 1A [976] at 16:15–22.)  Petitioners note that the charges in this case are for conduct "[b]eginning in or about at least 1993"—meaning, as they see it, that the term "early 1990s" necessarily refers to acts that preceded and were distinct from any of the conduct for which Petitioners were charged in this case.  (See, e.g., Superseding Indictment at 2.) Petitioners contend that reference to this prior-act evidence violated Rule 404(b) because it was intended to suggest to jurors that Petitioners were the type of people to commit the charged crimes related to fraudulent documents.  And the evidence was especially prejudicial, Petitioners say, because the Government repeatedly used the word "encounter" as a substitute for "arrest" throughout the trial and because, in this statement, the Government referred to actions taken when Julio was still a minor.[10]

References in opening statements are not, however, evidence.  *United States v. Keskes*, 703 F.3d 1078, 1086 (7th Cir. 2013).  To ensure that jurors understood the distinction between argument and evidence, the court gave, at the outset of the trial, an instruction that "statements, arguments, and questions by lawyers are not evidence."  (Trial Tr. Vol. 1A at 10:12–13.)  That

---

[10]    Petitioners cite a few other examples of how the word "encounter" was used to mean "arrest" during the trial.  (See, e.g., Trial Tr. Vol. 3A [978] at 505:22–506:3 (explaining that Petitioner Gerardo had stipulated that "[o]n August 19, 2002, at approximately 3:16 p.m. . . . [he] was encountered in the area of 3350 West 26th Street flashing the mica sign and attempting to sell fraudulent identification documents").)  The Government responds as if Petitioners believe that each such reference to "encounters" violated Rule 404(b), but the court understands Petitioners as merely seeking to establish that the word "encounter" was, in fact, equated with the word "arrest" during the trial.

point was repeated to jurors before they began deliberating.  (*See* Government's Final Jury Instructions [841] at 4 (noting that "lawyers' statements and arguments are not evidence").)

In most cases, this type of instruction adequately "protects against any prejudice resulting from a lawyer's reference during opening statements to evidence that ultimately is not admitted during trial."  *Jordan v. Binns*, 712 F.3d 1123, 1135 (7th Cir. 2013).  Courts presume that jurors follow limiting or curative instructions "unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002) (citing *Richardson v. Marsh*, 481 U.S. 200, 207–08 (1987)).  The brief statement highlighted by Petitioners here was not so incriminating as to overcome the presumption that the jurors followed the instructions they were given about the distinction between arguments and evidence.  In fact, Petitioners' previous contacts with police were referred to as "encounters" specifically to *protect* Petitioners from the prejudice that might arise from more explicit references to previous arrests.  But even if use of the word "encounter" was somehow objectionable—indeed, even if admission of a statement that the police had previous contacts with Petitioners was error—Petitioners have provided no reason to believe the error was prejudicial, given the considerable evidence of Petitioners' document-fraud conspiracy that the Government properly introduced at trial.  *See* Brief of the United States at 2–15, *Leija-Sanchez II*, 2015 WL 3819389 (summarizing the evidence).  In short, Petitioners have failed to show that it was either objectively unreasonable or prejudicial for their lawyers not to object to this minor part of the Government's opening statement at trial.

## II.     Use of the Term "Organization"

Petitioners contend that their lawyers were ineffective for failing to adequately object to the Government's repeated use of the term "organization" at trial.  Petitioners also argue that their lawyers were ineffective for failing to pursue this issue on appeal.  (Pet. at 10–16.)

The indictment alleged that Petitioners were the leaders of a criminal enterprise that the Government called the "Leija-Sanchez Organization."  (*See* Superseding Indictment.)  Before

trial, Petitioner Julio's counsel moved to strike those references from the charging document [188]. Defense counsel argued that the name "Leija-Sanchez Organization" was unduly prejudicial because it strongly implied that Petitioners Julio and Manuel were the leaders of the charged enterprise. Because such leadership was a disputed factual issue, the court granted the motion and directed the parties to "agree to a neutral name for the organization, one that does not suggest a presumption that Defendant Leija-Sanchez controlled it" [498]. Then, during the trial, Petitioner Manuel's counsel lodged a broader objection to any use of the word "organization" by the Government. (Trial Tr. Vol. 3B [1012] at 610:21–611:22.) Defense counsel argued that the existence of an organization was an element of the racketeering charges for which the Government bore the burden of proof. (*Id.* at 611:12–17.) The court sustained that objection and directed the Government "to the extent possible, [to] avoid the use of the word 'organization.'" (*Id.* at 612:17–614:5; *see also id.* at 613:12–15 ("It's just not hard to substitute other language. . . . You can call it group. You can call it association. You can call it the number of people you were working with.").)

Although defense counsel raised (and the court sustained) this objection to the Government's use of the term "organization," Petitioners believe that their lawyers should have repeated that objection when the Government continued to use the term in apparent violation of the court's ruling. (*See* Pet. at 13 (arguing that the Government continued to "badger[] the jurors" with the term "organization" throughout the trial).) Now, the Government argues in response that defense counsel's decision not to object was reasonable because these numerous uses of the term "organization" can be reconciled with the court's ruling. Whatever the merit of that argument, the court concludes that any error was harmless. The Government adduced a mountain of evidence about the existence and operation of Petitioners' criminal enterprise; an appeal from their conviction for conducting such an enterprise would have been frivolous. *See* Brief of the United States at 2–15, *Leija-Sanchez II*, 2015 WL 3819389

(summarizing some of this evidence).[11]  (*See also* Gov't's Resp. at 15–16 (citing pertinent parts of the trial record).)  There is no reasonable probability that absent the Government's use of the specific term "organization," the jury would have come to a different conclusion about whether a criminal enterprise existed or whether Petitioners were in charge of it.  The court thus concludes that Petitioners were not prejudiced by defense counsel's failure to repeatedly object to the Government's uses of the term, even if the court could find that this failure was objectively unreasonable.

By extension, the court concludes that Petitioners' counsel did not act objectively unreasonably by declining to press this issue on appeal.  Because the error made at trial, if any, was harmless, this issue was neither "obvious" nor "clearly stronger" than the issues ultimately pursued.  *See Gaetz*, 565 F.3d at 352.

## III.  Unqualified Expert Testimony

Petitioners contend that their lawyers were ineffective for failing to adequately object to certain testimony that, in their view, the Government's witnesses were not qualified to offer.  Petitioners also argue that their lawyers were ineffective for failing to address the issue on appeal.  (Pet. at 16–23.)

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  This rule permits expert testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to

---

[11]     In Petitioners' opening brief on direct appeal of their convictions, their lawyers acknowledged that Petitioners "operated a false document production and distribution ring in the Little Village neighborhood of Chicago. . . . There was ample evidence that the document ring produced and sold false Social Security cards, drivers licenses, green cards, and other documents for illegal immigrants living in the United States, and appellants do not appeal their convictions with respect to those offenses."   *See* Joint Brief of Defendant-Appellants at 21, *Leija-Sanchez II*, 2015 WL 1020389.

the facts of the case." FED. R. EVID. 702. The Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* sets forth several non-exhaustive factors to consider in evaluating the expert's methodology: "(1) whether the theory has been or is capable of being tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential rate of error; and (4) the theory's level of acceptance within the relevant community." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993)).

Petitioners' ineffectiveness argument focuses on two types of testimony the Government elicited at trial: testimony about cell phone towers and testimony about identification-card printers. As explained here, the court need not decide whether defense counsel acted unreasonably by failing to object to either type of testimony, because it is clear that the failures were not prejudicial to Petitioners.

### A.    Testimony About Cell Phone Towers

The Government elicited testimony from Dan Nagy, an agent with the Department of Homeland Security. (*See* Trial Tr. Vol. 1B [1011] at 97:24–203:19.) Agent Nagy, who worked in a unit focusing on document fraud, was one of three lead agents on the team that investigated Petitioners before they were indicted. (*Id.* at 99:2–103:3.) Agent Nagy discussed several investigative methods that his team used. (*Id.* at 103:4–13 ("We conducted physical surveillance. We cultivated a confidential informant. We used undercover agents, as you saw earlier, to purchase fraudulent documents. We did trash pulls. We installed pen registers and trap and traces on the telephones used by the leaders of the organization.").) Most relevant here, Agent Nagy discussed how his team wiretapped numerous phone calls involving Petitioners and their colleagues. (*Id.* at 106:7–117:8, 121:13–123:25.) This testimony served as important foundation for the introduction of the phone calls themselves, which were critical evidence for the Government.

Petitioners now contend that defense counsel should have objected to Agent Nagy's testimony because he was not proffered or qualified as an expert regarding "the scientific and technical functions of cell phone towers, cell phones, and their frequencies as nexuses to the telephone company's network." (Pet. at 18.) Their argument rests primarily on *United States v. Evans*, 892 F. Supp. 2d 949 (N.D. Ill. 2012). In *Evans*, a prosecution for kidnapping, the government sought to elicit testimony from a federal agent "about the operation of cellular networks and how to use historical cell site data to determine the general location of a cell phone at the time of a particular call." *Evans*, 892 F. Supp. 2d at 951. The agent intended to trace certain calls, which had been made by the defendant's cell phone, to the building where the victim was held for ransom. *Id.* On a pretrial motion *in limine*, the court concluded that the agent must satisfy Rule 702 to testify about the various factors (such as "topography, physical obstructions and the signal strength of other towers") that affect "whether a cell phone connects to the tower closest to it." *Id.* at 953–54.

Petitioners have cited only one excerpt of Agent Nagy's testimony that ostensibly triggers these concerns. Early in his testimony, when asked about "how cell towers work," Agent Nagy briefly explained how calls are routed from a cell phone to the nearest tower. (Trial Tr. 1B 115:12–22 ("A cell tower is where a cellular telephone company houses some of their equipment, specifically their antennas, so cell phones in your pocket right now are always searching for a strong signal. That's generally going to come from the closest cell phone tower. So when you make a cellular telephone call, radio frequency is sent through one of these cellular telephone towers back to the telephone company's network.").)

Neither in this brief comment nor elsewhere did Agent Nagy attempt to provide detailed analysis about the "variety of factors that determine the tower to which a cell phone will connect." *Evans*, 892 F. Supp. 2d at 953. He simply offered, by way of background, a basic

observation about cell phone networks.[12]  The court rejects the contention that Agent Nagy, who routinely conducts wiretap investigations, needed to be certified under Rule 702 to give such an answer.[13]  In any event, Agent Nagy's answer about "how cell towers work" was just *seven lines* of the 3,400-page trial transcript (which included over 100 pages of testimony by Agent Nagy himself).  Petitioners have failed to establish that this brief testimony, even if it was admitted in error, caused them any prejudice.

### B.     Testimony About Identification Card Printers

The Government also elicited trial testimony from Shane Jumper, another agent working on Agent Nagy's team.  (*See* Trial Tr. Vol. 2B [1024] at 428:23–446:22; *id.* Vol. 3A [978] at 456:8–505:18.)   Agent Jumper testified about the discovery and operation of printers that Petitioners used to make false identification documents.  In Petitioners' view, Agent Jumper's testimony "should have been limited to the discovery of the printing computer and his proffered training on how to detect fraudulent identification documents."  (Pet. at 21–22.)  They believe that defense counsel should have objected to Agent Jumper's testimony about the "technical and specialized functions" of document printers because he was not qualified as an expert.

As with their criticism of Agent Nagy's testimony, Petitioners' argument misses the forest for the trees.  They cite only one brief excerpt from Agent Jumper's testimony in which he ostensibly discussed the "technical and specialized functions" of document printers.  When discussing the equipment his team discovered during their search of Petitioner Gerardo's residence (Trial Tr. Vol. 2B at 438:20–446:22), Agent Jumper briefly commented on the

---

[12]     Unlike in *Evans*, where the precise location of the disputed phone calls was critical to the prosecution's case, the location of phone calls was not disputed in this case.  To the extent that Agent Nagy remarked on the location of the phones that made the calls his team wiretapped, he merely placed those phones broadly within the Northern District of Illinois—a fact that Petitioners do not contest.

[13]     It is also worth noting that, in *Evans*, the court held that the agent *could* "provide lay opinion testimony concerning (1) the call data records obtained for [defendant's] phone and (2) the location of cell towers used by [defendant's] phone in relation to other locations relevant to the crime."  *Evans*, 892 F. Supp. 2d at 954.

identifying features of a particular mode of printer (*id.* at 445:1–446:22 (describing the visible marks of a "Zebra model P310 high-speed identification card printer," including "the two blue circles [at] the ends of spools").)   But the Government introduced abundant evidence that Petitioners produced false identification documents, and Petitioners have not established that these few details described by Agent Jumper were dispositive of, or even material to, any issue in the case.  Even if counsel's failure to object to Agent Jumper's testimony on this score had been objectively unreasonable (it was not), Petitioners have not established that the failure prejudiced them.

## IV.    Reading of Transcripts by Non-witnesses

Petitioners' next argument concerns how the Government presented the numerous wiretapped phone calls involving Petitioners and their coconspirators.  As discussed above, Agent Nagy was examined and cross-examined about the process through which the wiretaps were conducted.  (*See* Trial Tr. Vol. 1B at 97:24–203:19.)   The Government also elicited testimony from two translators, Gisela Estrada and Angelica Araujo, that it hired to translate the recordings into English.  (*See* Trial Tr. Vol. 2A [977] at 209:17–295:6; *id.* Vol. 2B at 312:25–345:9.)  Estrada and Araujo were subject to cross-examination about their qualifications and methods.  (*Id.* Vol. 2A at 247:7–260:21, 264:21–265:25; *id.* Vol. 2B at 319:7–337:14.)   After Estrada and Araujo had testified, the Government provided the jurors with binders containing the English-language transcripts.  (*Id.* Vol. 2B at 345:12–23.)  Then, the Government employed non-witness interns to read portions of these transcripts aloud in the courtroom.  (*See, e.g.*, *id.* at 346:14–16, 363:3–398:13; *id.* Vol. 3A at 470:12–494:2.)   Defense counsel raised some concern with this procedure but did not object under the Confrontation Clause.  (*See, e.g.*, *id.* Vol. 2B at 360:18–361:19.)  Petitioners now contend that counsel was ineffective because of that failure.  (Pet. at 23–30.)

The Confrontation Clause of the Sixth Amendment was not implicated here.  That Clause assures that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

confronted with the witnesses against him." U.S. CONST. amend. VI.  This provision bars "the admission of testimonial hearsay against a criminal defendant unless two conditions are met: (1) the declarant must be unavailable to testify and (2) the defendant must have had a prior opportunity for cross-examination."  *United States v. Vitrano*, 747 F.3d 922, 924 (7th Cir. 2014) (citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004)).  A defendant's confrontation right is implicated only if the out-of-court statement is both (1) hearsay and (2) testimonial in nature. *United States v. Tolliver*, 454 F.3d 660, 665–66 (7th Cir. 2006).  The statements at issue here were neither hearsay nor testimonial.

Notwithstanding several exceptions, an out-of-court statement generally constitutes hearsay if it is "offered in evidence to prove the truth of the matter asserted."  *Id.* at 666 (quoting FED. R. EVID. 801).  The category of "testimonial" statements is somewhat fuzzier.  The Supreme Court has suggested that a statement is testimonial if it was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009) (quoting *Crawford*, 541 U.S. at 51–52); *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (noting that a statement is testimonial where its "primary purpose" was "to establish or prove past events potentially relevant to later criminal prosecution"); *Jones v. Basinger*, 635 F.3d 1030, 1041 (7th Cir. 2011) (noting that "the term [testimonial] clearly pertains to statements made 'in anticipation of or with an eye toward a criminal prosecution'" (quoting *Tolliver*, 454 F.3d at 665)).

Petitioners complain that when the phone call transcripts were read aloud in court, defense counsel was not able to cross-examine the "parties [to] the conversations," the "interceptors" (i.e., the agents who conducted the wiretaps), or "those who transcribed them" (i.e., Estrada and Araujo).  (Pet. Reply at 10.)  This argument reads the Confrontation Clause far too broadly.  The agents who conducted the wiretaps did not participate in the underlying phone conversations; they did not make any of the statements contained in the transcripts and could

16

not conceivably be considered hearsay declarants. Petitioners thus had no Sixth Amendment right to confront those agents when the transcripts were presented.[14] Even the individuals who did participate in the phone conversations were not hearsay declarants, nor were their statements testimonial in nature. Any statements made by a Petitioner himself, or made by one of his coconspirators "during and in furtherance of the conspiracy," was categorically not hearsay. FED. R. EVID. 801(d)(2)(A), (E). The statements in the wiretapped phone conversations would fit within these hearsay carveouts even if they were being offered for their truth, which was not the case. In any event, the conversations occurred as part of Petitioners' underlying criminal conduct, not in anticipation of a prosecution, so they were not testimonial in nature. *See United States v. Hargrove*, 508 F.3d 445, 449 (7th Cir. 2007). That is true even to the extent that Petitioners or their coconspirators unwittingly made statements to informants who were participating in the calls in aid of the Government's investigation. *See id.* (citing *Bourjaily v. United States*, 483 U.S. 171, 182 (1987)). In sum, there was no conceivable Confrontation Clause violation with respect to the wiretapping agents or the phone call participants, and defense counsel acted reasonably in declining to object on this basis to the Government's presentation of the transcripts.

Whether Petitioners had a right to confront the translators might in some circumstances be a closer question. In *Bullcoming v. New Mexico* and *Melendez-Diaz v. Massachusetts*, the Supreme Court held that forensic analysts who created reports for criminal prosecutions were "witnesses" within the meaning of the defendants' confrontation rights. *Bullcoming v. New Mexico*, 564 U.S. 647, 651 (2011); *Melendez-Diaz*, 557 U.S. at 310–11. In each case, the analyst's affidavit, which reported the results of a laboratory analysis, was testimonial hearsay because the report was "created specifically to serve as evidence in a criminal proceeding." *Bullcoming*, 564 U.S. at 651 (affidavit certifying that defendant's blood-alcohol concentration

---

[14] The court reiterates that defense counsel was able to cross-examine Agent Nagy about the wiretapping *process*, which provided foundation for the transcripts to be introduced.

exceeded a legal threshold); *see also Melendez-Diaz*, 557 U.S. at 310–11 (affidavit certifying that a suspect substance was cocaine).

Petitioners could perhaps argue that the translators in this case were similar to the forensic analysts in *Bullcoming* and *Melendez-Diaz*. Estrada and Araujo completed the translations with the express purpose of creating "court-ready" transcripts for use by the Government. (*See, e.g.*, Trial Tr. Vol. 2A at 213:19–214:12.) And they certified, at least implicitly, that the English-language transcripts reflected accurate translations of the Spanish-language recordings. But any Confrontation Clause challenge to their testimony fails for the obvious reason that the translators *were* subject to cross-examination by defense counsel. As Petitioners point out, this cross-examination preceded the reading of the transcripts, but Petitioners provide no cogent reason why that ordering violated the Confrontation Clause. The court is thus not persuaded that defense counsel was unreasonable in failing to make a Confrontation Clause objection. In any event, again, Petitioners have not established that they suffered prejudice because of this failure. For example, they gesture broadly at the idea that the meaning of a Spanish word may vary depending on what part of Mexico the speakers are in, but they do not provide any specific examples where the transcripts introduced at trial were inaccurate—whether because of this geographic variability or for any other reason. (*See* Pet. at 24.) The court thus rejects Petitioners' ineffective assistance claim on this ground.

## V. Treatment of Unintelligible Transcript Excerpts

Petitioners contend that their lawyers were ineffective for failing to adequately object to the trial court's treatment of indecipherable portions of wiretapped phone calls. (Pet. at 30–33.)

When the Government's translators were unable to decipher the phone recordings, they marked the written transcript with bracketed phrases such as "[inaudible]" or "[unintelligible]." Initially, the Government's interns read these bracketed phrases aloud—stating, for example, "Open bracket, unintelligible, close bracket." (*See* Trial. Tr. Vol. 3A at 452:20–21.) At some point, the Government and defense counsel agreed to end this tedious practice so that the

readings would proceed more smoothly. (*Id.* at 452:17–23.) The court promptly alerted the jurors to the change before the readings recommenced. (*Id.* at 455:15–456:1.) Later, one of the defense lawyers changed course and requested that readers resume using the words "unintelligible" or "inaudible" but continue not to say "bracket." (*Id.* Vol. 5A [980] at 781:2–782:13.) The Government agreed, and the court again promptly alerted the jurors to the change. (*Id.* Vol. 5B [1014] at 917:20–918:3.)

Petitioners now complain that the initial practice of skipping bracketed phrases falsely presented the transcripts "as if they were full conversations instead of pieced together." (Pet. at 30.) The eventual change to this practice was inadequate, in their view, because it did nothing to cure the previous omissions. (*Id.* at 32.) The court need not engage with the merits of this evidentiary point or inquire whether defense counsel might have acted unreasonably by failing to make a stronger objection. Petitioners' concern is entirely speculative; they have not identified a single instance in which the references to unintelligible portions of the recordings resulted in a misleading or unfair characterization of the recorded conversations. In short, they have failed to establish any prejudice. The court therefore rejects Petitioners' argument that counsel was ineffective for failing to object to this manner of presenting evidence.

## VI.   Admission of Bullets and Shell Casings

Petitioners contend that their lawyers were ineffective for failing to challenge, on appeal, the chain of custody and admissibility of the bullets and shell casings from the murder scene in Mexico. (Pet. at 33–35.)

To admit a physical exhibit into evidence, "[t]he government need only show that it took reasonable precautions to preserve the original condition of the evidence." *United States v. Godinez*, 7 F.4th 628, 636 (7th Cir. 2021) (quoting *United States v. Lee*, 502 F.3d 691, 697 (7th Cir. 2007)). "In making the admissibility determination, the district court employs a 'presumption of regularity' and assumes that the government officials who had custody of the exhibits discharged their duties properly." *United States v. Tatum*, 548 F.3d 584, 587 (7th Cir. 2008)

(quoting *United States v. Scott*, 19 F.3d 1238, 1245 (7th Cir. 1994)); *see also Vitrano*, 747 F.3d at 925 ("[I]n the absence of evidence to the contrary, we assume the police did not tamper with the evidence."). "The government is not required to prove a perfect chain of custody, as gaps in the chain go to the weight of the evidence rather than its admissibility." *Lee*, 502 F.3d at 697.

At trial, the Government introduced bullets and shell casings that ostensibly had been retrieved from the murder site in Mexico. (*See* Pet. at 34–35 (summarizing the Government's testimony about the chain of custody).) The court concluded, over various objections by defense counsel, that the Government had met its burden of establishing that reasonable precautions had been taken to preserve this evidence, and observed that the jurors were responsible for determining how any gaps in the chain of custody should bear on the weight of the evidence. (*See, e.g.*, Trial Tr. Vol. 12B [1018] at 2274:11–2277:23 (discussing such objections); Feb. 7, 2014 Order [911] at 3 (rejecting the defense's post-trial request for a new trial on the basis of chain-of-custody issues, and noting that "gaps in the chain go to the weight of the evidence rather than its admissibility" (quoting *Lee*, 502 F.3d at 697)).)

Petitioners now urge that their counsel should have pursued the chain-of-custody argument on appeal. To establish ineffective assistance by their appellate counsel, Petitioners must show that counsel "failed to raise an issue that was both obvious and clearly stronger than the issues he did raise." *Gaetz*, 565 F.3d at 352. Petitioners have not done this. "[A] district court's evidentiary rulings, including matters pertaining to the chain of custody, are reviewed for abuse of discretion." *Smith*, 308 F.3d at 739. Petitioners have provided no reason to believe that the court abused its discretion in admitting the bullets and shell casings at trial. In fact, Petitioners themselves have appropriately summarized the testimony that laid the foundation for the admission of this evidence. (Pet. at 34–35.) The court recognized then, and reiterates now, that any gaps in the chain of custody went to the weight, not the admissibility, of the evidence. Although Petitioners vaguely question whether "Mexican government officials discharged their duties properly" (Pet. at 35), they have given no reason that the presumption of regularity should

not have applied in their case. The court rejects their argument that defense counsel was ineffective for failing to pursue the chain-of-custody issue on appeal.

## VII.    Jury Instruction for Conspiracy to Commit Murder Abroad

Petitioners contend that their trial lawyers were ineffective for failing to object to the jury instruction regarding 18 U.S.C. § 956 (Counts 6 and 7). (Pet. at 35.)

The Government's proposed instructions explained that, in order to convict Petitioners under § 956, the jury needed only to find that at least one of the coconspirators was "within the jurisdiction of the United States" when the agreement to commit the murder was made and when an overt act was taken. (Gov't's Final Jury Instructions at 55, 60.) Petitioners' trial counsel did not object to this instruction (Trial Tr. Vol. 16A [994] at 2867:12–2869:13), and the court adopted it (*id.* Vol. 18 [1003] at 3230:4–23, 3233:15–3234:9). The jury convicted each Petitioner under § 956.

On direct appeal, Petitioners Manuel and Gerardo challenged the § 956 jury instruction, focusing on its treatment of the statutory phrase "within the jurisdiction of the United States."[15] According to Petitioners, a conviction for a violation of § 956 requires that the defendant himself have been located in "territory subject to United States sovereignty" at the time of the conspiracy. *Leija-Sanchez II*, 820 F.3d at 901. Because the jury instruction allowed for conviction of Manuel and Gerardo despite their having been on Mexican soil at the time of the conspiracy, they contended that the instruction misstated the law. The Government, by

---

[15]    Section 956 provides as follows: "Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder . . . if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2)." 18 U.S.C. § 956(a)(1).

Julio, who was in the United States at the time of the alleged agreement and overt act, did not challenge the § 956 jury instruction on direct appeal, presumably because he could not have been prejudiced by trial counsel's failure to object.

contrast, argued that the § 956 instruction was accurate because the statute does not require that a defendant himself be located on U.S. soil at the time of the conspiracy.

Because Petitioners' counsel had not raised any objection to the jury instruction at trial, the Seventh Circuit, on direct appeal, reviewed the instruction only for plain error. *Id.* at 902; *see also United States v. Noel*, 581 F.3d 490, 499 (7th Cir. 2009). Applying the plain-error standard, the Seventh Circuit rejected Petitioners' challenge to the language of the instruction. The court concluded that the correct "meaning of the word 'jurisdiction' is not 'clear or obvious,'" as would be necessary for a finding that the instruction had been clearly erroneous. *Leija-Sanchez II*, 820 F.3d at 901–02. The court listed several possible constructions of the word "jurisdiction": "Maybe the word means the territory of the United States, see 18 U.S.C. § 5; maybe it means prescriptive authority; maybe it means something like the 'special maritime and territorial jurisdiction of the United States,' a phrase defined in 18 U.S.C. § 7." *Id.* Petitioners' favored reading could be correct, but so could the Government's or other readings still. *Id.*

Petitioners now contend that their counsel was ineffective for the initial failure to object to the § 956 instruction at trial. They are correct, of course, that a failure to object to an erroneous jury instruction may sometimes constitute deficient performance. "There is no conceivable strategic reason for a defense lawyer to forgo a challenge to a prejudicial jury instruction; a mistake of law is deficient performance." *Cates v. United States*, 882 F.3d 731, 736 (7th Cir. 2018); *Vinyard*, 804 F.3d at 1225 (similar). In reviewing the § 956 instruction on direct appeal, the Seventh Circuit observed that an objection to it might have had some purchase, but noted as well that no other Circuit had "given § 956 the meaning [that Petitioners] prefer." *Leija-Sanchez II*, 820 F.3d at 902. But even if Petitioners could satisfy *Strickland*'s deficient-performance requirement by establishing that the jury instruction was legally erroneous—which they have not done—their argument fails because any error in their § 956 conviction was harmless.

The Seventh Circuit's recent decision in *Ruiz v. United States* is instructive. *See* 990 F.3d 1025 (7th Cir. 2021), *cert. denied*, No. 21-6200, 2022 WL 892143 (U.S. Mar. 28, 2022). In *Ruiz*, a § 2255 petitioner challenged the validity of his convictions under 18 U.S.C. § 924, for which he had been sentenced to a 45-year term of imprisonment. *Id.* at 1027. The Seventh Circuit affirmed the district court's conclusion "that any error relating to the § 924(c) convictions was harmless because Ruiz faced seven life sentences, including two mandatory life sentences," under separate statutes. *Id.* at 1029. Put another way, Ruiz could not establish "any prejudice befalling him from any erroneous § 924(c) convictions." *Id.* at 1031 (noting that "it is difficult to see how any relief—even a complete vacatur of the § 924(c) convictions and their accompanying sentences—would reduce the time that Ruiz must serve in prison").

With respect to their § 956 convictions, Petitioners are in a similar situation as Ruiz. Any error in these convictions (Counts 6 and 7), for which they were sentenced to 20 years imprisonment, are harmless given that Petitioners are also serving mandatory life sentences under 18 U.S.C. § 1959 (Count 3). They have therefore failed to demonstrate that their lawyers' failure to object to the § 956 jury instruction, even if assumed to be objectively unreasonable, was prejudicial. The court rejects their ineffectiveness claim on this ground.

## VIII. Voice Identification of Gerardo Salazar-Rodriguez

At trial, three Government witnesses testified that "Chapulin," an individual involved in numerous recorded phone calls, was a nickname for Gerardo. (*See* Trial Tr. Vol. 3B at 583:13–584:8 (testimony of Rudolfo Ibarra Martinez); *id.* Vol. 6B [1022] at 1183:15–185:1 (testimony of Gerardo Jimenez); *id.* Vol. 10B [1016] at 1925:14–1926:24 (testimony of Bruno Freddy Ramirez Camela).) Establishing the link between Chapulin and Gerardo was key to the Government's case against Gerardo because, during the phone calls in question, Chapulin openly discussed carrying out the murder of Montes in Mexico. *See, e.g.*, Joint Brief of Defendant-Appellants at 7–9, 11–16, *Leija-Sanchez II*, 2015 WL 1020389 (summarizing numerous phone calls involving Chapulin).

Gerardo's trial lawyers disputed the Government's contention that Gerardo was Chapulin. (*See, e.g.*, Trial Tr. Vol. 17B [996] at 3079:1–10 ("[M]y client is not Chapulin . . . . You heard his voice when he was up there.  He was up on the stand for quite a while.  You heard the tape that the prosecution played.  Compare the voices.  They aren't the same").)  Gerardo now argues, however, that his lawyers were constitutionally ineffective for failing to introduce evidence that better supported this defense.  Somewhat confusingly, his two briefs discuss two different forms of voice-identification evidence that he believes his lawyers should have introduced.[16]  In Gerardo's first brief addressing this issue, he argues that his lawyers failed to introduce a voice exemplar that ostensibly had been created before trial.  According to Gerardo, this exemplar would have allowed "the physical properties of his voice [to] be compared with that of Chapulin on the recordings."  (Mot. for Court to Entertain Add. Claims of Ineffective Counsel, No. 18 C 269 [*10] at 5.)  This argument does not withstand scrutiny.  Gerardo himself took the stand and testified extensively at trial.  (*See* Trial Tr. Vol. 15A [992] at 2631:11–2636:4; *id.* Vol. 15B [993] at 2660:20–2738:8.)  The jury did not need this dedicated "exemplar" to effectively evaluate the Government's theory that Chapulin's voice was Gerardo's.

Gerardo's reply brief, on the other hand, focuses on his counsel's failure to successfully call an expert witness to testify about the difference between Gerardo's voice and Chapulin's.  As Gerardo acknowledges, defense counsel did attempt to proffer a voice expert, Dr. Alan Yu.  The Government moved to bar Dr. Yu's testimony for untimeliness and, more substantially, for failure to satisfy various requirements of *Daubert*.  (Gov't's Mot. to Bar Test. of Alan Yu [820] (hereinafter "Mot. to Bar").)  This court granted that motion [830].  Dr. Yu's report offered, at best, tepid rebuttal evidence.  As quoted in the Government's motion (the report itself is not in

---

[16]    As mentioned above, Petitioner Gerardo did not discuss this voice-identification issue in his opening brief.  He raised it for the first time in a motion filed several weeks later.  The court granted his motion and agreed to entertain the belated argument, subject to the Government's objections.  The Government, disappointingly, made no mention of this argument in its response, but the court is able to resolve it without additional briefing.

the record), Dr. Yu stated simply that he was "unable to ascertain if [Gerardo Salazar Rodriguez]'s voice matches one of the three voices on the phone calls."  (Mot. to Bar at 16.)  Gerardo now argues that if his counsel had "made use of the voice analysis expert in a timely manner, he could have demonstrated that he was not the person 'Chapulin' [in] the recorded conversations."  (Movant's Reply, No. 18 C 269 [*32] at 5.)  True, the court barred Dr. Yu's testimony in part for untimeliness, but Gerardo has failed to demonstrate how such testimony could have satisfied *Daubert* standards.  The Government asserted in its original motion that "[n]o federal court since *Daubert* . . . found admissible expert testimony concerning voice spectrography or aural voice identification—as defendant seeks to do here."  (Mot. to Bar at 8.)  Gerardo has not presented any legal authorities undermining that statement, and the court itself has found none.  His lawyers were not constitutionally ineffective for their failure to successfully present a voice-identification expert at trial.

## IX.    Cumulative Errors

Finally, Petitioners contend that they received ineffective assistance as a result of cumulative error.  (Pet. at 37.)  Where a defense attorney "made multiple errors as opposed to a single error, the cumulative effect of those errors should be considered together to determine the possibility of prejudice."  *Earls v. McCaughtry*, 379 F.3d 489, 495–96 (7th Cir. 2004).  Petitioners have made no meaningful contention about the cumulative effect of their counsel's disparate alleged errors.  The court concludes that Petitioners have not established that they received ineffective assistance through cumulative error.

## CONCLUSION

For the reasons given above, the court denies Petitioners' motions and directs the Clerk to enter judgment in favor of the United States. The court declines to issue a certificate of appealability under 28 U.S.C. § 2253(c)(2).  Petitioners have not made a substantial showing of the denial of a constitutional right, and reasonable jurists would not debate, much less disagree,

with this court's resolution of their claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2)).

ENTER:

Dated: May 4, 2022

_____
REBECCA R. PALLMEYER
United States District Judge